UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED 2016 P II: 56
DISTRICT COURT SDNY

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-5-16

Laurel L Sheck

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

16 Civ. 6664 (CM)

**AMENDED COMPLAINT**

-against-

Westchester County, NY
Putnam County, NY
Children's Village
Andrew Baraji[?]iah

Jury Trial: ☑ Yes ☐ No
(check one)

RECEIVED SDNY PRO SE OFFICE 2016 DEC -5 PM 3:00 S.D. OF N.Y.

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**I. Parties in this complaint:**

A. List your name, address and telephone number. If you are presently in custody, include your identification number and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff
Name: Laurel Sheck
Street Address: 25 High Acre Rd
County, City: Fairfield County, Weston
State & Zip Code: CT 06883
Telephone Number: 914-400-5908

B. List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

*Rev. 12/2009*

1

1.  This is a civil rights action, pursuant to 42 U.S.C. 1983, in which plaintiff seeks damages to redress the deprivation, under color of state law, of rights secured to her under the Fourth and Fourteenth Amendments of the United States Constitution. Plaintiff, at all times a fit parent, was deprived of her right to DUE PROCESS by way of an invalid PINS petition and its subsequent disposition(s). Plaintiff was also denied due process by way of Defendant's unlawful actions in her son's PINS case, which resulted in her minor child being unlawfully removed; Defendants removed the (then) minor child from Plantiff's mother, wrongfully and without cause or consent. Defendant's acts resulted in Plaintiff being deprived, under 42 USC 1983, of a parent's "fundamental liberty interest in the care, custody and control of their children."

2.  Plaintiff acknowledges that her son must file his own suit and that she may not file on his behalf; Plaintiff respectfully asks the Court to tolerate her repeated references to her son's case and how it was handled, and Plaintiff contends her own civil right to raise her child free from government interference and to due diligence were denied directly as a result of her son's PINS case. In short, unlike an article ten petition, where a parent's rights could be violated as a result of their own alleged actions which LED to the removal of a child, and which would be subject to the parent's "day in court", the outcome of a PINS petition can result in a child's removal BY WAY OF THE CHILD'S ACTIONS. However, these are not mutually exclusive; Plaintiff claims her civil rights as mentioned were violated as a direct result of her child's civil rights having been violated, eg, the removal of her son injured plaintiff as well as her son, and happened by way of the handling of her child's case.

3.  Plaintiff acknowledges the multiple parties that for various reasons including judicial immunity, are not parties to this suit, and respectfully asks the Court to allow for their names to be used so that a clear picture ("cause of action") may be presented.

4.  Plaintiff does not seek a review of any family court orders nor is there any matter pending in family court; plaintiff's son is now 20 years old.

5.  Plaintiff does request the Court allow Children's Village and Andrew Barijikian to be named as defendants and "State actors" by way of the following conditions that DO allow for private agencies and individuals to be named as State Actors for 1983 purposes; * Plaintiff claims: a) the state has coerced the private sector to commit an act that would be unconstitutional if done by the state as outlined further in this complaint; b) the state has sought to evade a constitutional duty through delegation of private actor; c) the state has delegated the traditionally and exclusively public function to a private act; and d) the state has committed an unconstitutional act in the course of enforcing the right of a private citizen. (*See footnote)

6.  Plaintiff offers the following timeline for the Court:

    a) 3/2012 Petitioner filed a custody petition in family court requesting sole custody of (then) minor child, Sage. Judge Klein was assigned. Plaintiff retained an attorney whose law partner had been in a partnership with Jude Klein; judge Klein recused himself.
    b) The case was assigned to Judge Greenwald.
    c) Judge Greenwald asked for a summary and was told that the child wanted to live with his father because his mother is too strict. He was also advised that the child was acting out and experimenting with marijuana and that Plaintiff believed that living with his father would be dangerous for the child, due to his fathers long history of drug related convictions.
    d) Plaintiff removed first attorney from her service and appeared pro se.
    e) 4/2012 Judge greenwald proclaimed "this isn't a custody issue, this is a PINS issue". He brings in Attorney Rosoff from the hallway and assigned him to represent plaintiff. Judge Greenwald orders a "home visit" and report to the court for custody. It is assigned to Leslie Pearson.

f) 4/2012 Leslie Pearson phones plaintiff and the child's father to arrange home visits. She meets first with the child and his father, in Brewster NY which is in Putnam County and out of her jurisdiction. Plaintiff believes Ms. Pearson, too, "took matters into her own hands". The minor child and his father tell Ms. Pearson stories about my alleged abuse of Sage and unfitness as a parent; Ms. Pearson asks Sage for his cell # and says she will be in touch.

g) Ms. Pearson calls me to arrange an interview. She says it must be done at my home M-F and can not be done after 3 pm. I explain I've just started a new job and cant leave early or come in late. I ask if anyone else can do it at another time and am advised "no".

h) Ms. Pearson harasses plaintiff at work repeatedly, saying she would have to report plaintiff as uncooperative if she does not work within the timeframe given. Pearson refuses to let plaintiff off of her cell phone when informed plaintiff is on her cell phone, driving, lost, crying, and missing a doctor's appointment.

i) 4/2012: Ms. Pearson phones Sage and makes arrangements to meet him, without my knowledge, at my home, and to enter it without my permission. A contractor doing work at my house saw Sage meet with an adult (Leslie Pearson) and called me at work. I asked to speak to Sage who hung up on me when Ms. Pearson instructed him to do so. When I called right back, my home phone WAS ANSWERED BY LESLIE PEARSON. I advised her she could not meet with Sage or go into our home, and that she must leave my property. I then called and asked for a supervisor who, upon hearing this, immediately removed Ms. Pearson from the case.

j) 5/12 Judge Greenwald repeats his assertion that this is a PINS matter; Plaintiff's attorney informed the judge that Plaintiff did not want to file a PINS petition due to fear of losing her child. The judge ordered one or both parents to file a PINS petition; neither party knew the judge could not order such a thing, or that no order was ever produced; plaintiff's attorney advised her she must obey the judge's orders.

k) 5/2012: Plaintiff met with Westchester County probation and was advised Sage's behavior did not constitute PINS behavior.

l) 5/12: Plaintiff informed her attorney, who informed Judge Greenwald, that Probation would not consent to a PINS petition. Judge Greenwald then met with plaintiff's attorney alone and ordered me to make a new petition and have plaintiff's attorney bring it directly to the Judge.

m) 6/2012: Plaintiff complied. Judge Greenwald kept the petition; he did not send it to probation as required by law.

n) 11/17/2012: Judge Greenwald sends the petition to probation "for diversion services". It is assigned to PO Malandrino.

o) 11/20/12: PO Malandrino makes appointments to meet with all parties.

p) 11/22/12: PO Malandrino meets with Sage and his father

q) 11/23/12: PO Malandrino meets with Plaintiff who immediately asks about diversion services to which Malandrino replied "this is way past diversion services". This is a large basis of this complaint.

r) 11/23/12 – 4/2013: Malandrino continues to inform all parties that Sage nothing would happen although there may be a change of custody to the father. She encourages plaintiff to notify her of anything inappropriate on behalf of sage or his father so she can intervene and help. Each time Sage got in trouble plaintiff informed PO Malandrino; ultimately Malandrino filed a violation of the PINS status and receommended a conditional discharge. Plaintiff asks Malandrino the procedure to withdraw a PINS petition and is told there is no such procedure; there is.

s) Both Sage and his father continue to get in trouble. Sage is living with his father who was then arrested (3/2013) for felony possession of drugs, felony probation violation and endangering the welfare of a minor (Sage). The father was put in jail.

t) This was reported to Putnam County CPS and assigned to Carryann Rice who did not inform plaintiff that the minor's father was in jail and that the minor was now in the care of his grandparents. Plaintiff read about the arrest online and confronted Ms. Rice to bring Sage back to plaintiff's custody. Instead, Ms. Rice informed plaintiff that Sage said he would live with me if his father stayed in jail, but that he was fine with his grandmother and she would leave him there. THIS WAS MY CHILD. No one else had any standing to parent him or have any type of custody of him. Ms. Rice informed me there was nothing she could do since Sage was now 17, yet his father was arrested for endangering the welfare of a minor!

u) 4/2013: Sage continued to act out while in his grandmother's care and without being afforded the opportunity to go home to plaintiff, his PINS disposition was violated.

v) 5/15/13: We are in court now in front of Judge Malone on the violation of a conditional discharge. With no warning, and no basis (as set forth later in this complaint), PO Malandrino requests Sage be sent to non secure detention. (Children's Village).

w) 5/15/13: PO Malandrino separates Sage and plaintiff who are hugging each other and crying; she says the van is on the way for Sage. She insists plaintiff sign permission forms; when plaintiff refuses to sign them on the spot PO Malandrino informs the child's father that if he doesn't sign them there will "be more problems".

x) 5/15/15: Plaintiff immediately contacts Children's Village and is put in touch with Andrew Barijikian. Plaintiff provides him a brief outline, says that Sage has been lying about plaintiff's abuse in order to live a more permissive life with his father, and that all cps and other reports of abuse were unfounded. Barijikian assures plaintiff Sage is doing well via email (attached).

y) 5/22/15: Barajikian emails plaintiff that sage's behavior is "perfect".

z) 5/27/13: PO Malandrino's attitude completely changes in spite of Sage's report of "perfect behavior". She makes statements such as "if he won't go to live with you he will have to go away". She refuses to be more specific. Plaintiff emails Barijikian to find out what happened and was told to contact Probation.

aa) 5/29/13: Sage informs Barijikian that he made everything up and that he would be fine living with me. Barijikian withholds this exculpatory evidence in spite of plaintiff's request he provide it to all parties. He speaks now of further placement with no explanation.

bb) 5/29/13: Child's father approaches PO Malandrino with the idea of Sage living with ffamily friends who lives app. 1/8 of a mile from plaintiff. Malandrino pursues this avenue with no notice to me. She calls the family friend, Mahdy Franco, and asks if she would be willing to take custody of Sage temporarily so that he did not have to been sent to a long term detention facility, and so that he could live near his home and attend his regular high school. She informs Mrs. Franco that Sage and plaintiff will be in ongoing therapy, that he would go to his mother's on the weekends, and that this would last about 6 months. Mrs. Franco agrees in order to keep Sage from being sent away.

cc) 5/30/13 Child's father informs me of this arrangement and I go to the franco's to find out what was going on. Mrs. Franco told me everything outlined in "bb". I thanked her for her offer to help and informed her that as I was a fit parent, I would not give her custody of my son for no reason, and she understood.

dd) 5/31/13: Plaintiff confronts Po Malandrino about this plan and is assured "this is just an alternative if Sage refuses to come home with you". Plaintiff reminds her that Sage has already told Barijikian that he lied about me and that he would live with me. He subsequently states that in court to Judge Malone as well.

ee) 6/6/2013: Court appearance Judge Malone. PO Malandrino advises the court that she had an "appropriate family to take Sage and keep him in his school and neighborhood, but plaintiff 'got to them' and they would no longer take custody of Sage. PO Malandrino asked the court to order the Franco's to file a custody petition; the court said they could not do that. PO Malandrino then said she would be sending out "placement packages" for Sage to go away. At no time did PPO Malandrino inquire about any of the local, ready willing and able family members who would take Sage, as required by law. At no time did she explain why Sage could live ¼ of a mile from plaintiff and be "free", but could not live with Plaintiff. There is simply no other explanation except to keep Sage from plaintiff.

ff) 6/14/13: Court appearance judge Malone. Hearing. Although required by law to be submitted to sage's attorney ten days before the hearing, all reports are handed to counsel in court; they are unable to be read as they proceeded to a "hearing". Sage was sentenced to stay at Berkshire Farm (2 ½ hours away from Plaintiff in violation of the law) until his 18th birthday. His counsel objects, noting that if he was alright to live in the neighborhood that there was no reason to send him away. Judge Malone tells Sage "I hope you don't see either one of your parents for a long time".

gg) 6/15/13: Plaintiff contacts Berkshire farm and speaks to Sage's caseworker Ashely Spence who says sage is scared and will call me soon.

hh) 6/19/13 Plaintiff advises Ms Spence of everything that happened. Ms. Spence confims Sage does not belong at Berkshire Farm and they will do everything they can do get him home to plaintiff asap.

ii) DSS and Marisol Haralman inform Berkshire Farm and Plaintiff that regardless of Berkshire's assessment, Sage can not be released for many months, and unless we both participate in aparentin course called "parenting with love and limits". This course is required although sage was supposedly sent away for a PINS violation

jj) DSS does

kk) Put as simply as possible, Plaintiff claims that Probation, Social Services, Children's Village and indeed the judges involved in her son's PINS case decided they "knew what was best for the minor child (Sage), IN SPITE OF ALL EVIDENCE INDICATING PLAINTIFF WAS A FIT PARENT, and would go to any lengths necessary to keep the child from his Mother. Unable to

(v) determine whether an assessment of the youth for substance use disorder by an office of alcoholism and substance abuse services certified provider is necessary when a person seeking to file a petition alleges in such petition that the youth is suffering from a substance use disorder which could make the youth a danger to himself or herself

or others. Provided, however, that notwithstanding any other provision of law to the contrary, the designated lead agency shall not be required to pay for all or any portion of the costs of such assessment or for any substance use disorder or detoxification services, except in cases where medical assistance for needy persons may be used to pay for all or any portion of the costs of such assessment or services. The office of alcoholism and substance abuse services shall make a list of its certified providers available to the designated lead agency.

(c) <u>Any person or agency seeking to file a petition pursuant to this article which does not have attached thereto the documentation required by subdivision (g) of this section shall be referred by the clerk of the court to the designated lead agency which shall schedule and hold, on reasonable notice to the potential petitioner, the youth and his or her parent or other person legally responsible for his or her care, at least one conference in order to determine the factual circumstances and determine whether the youth and his or her family should receive diversion services pursuant to this section.</u>

Diversion services shall include clearly documented diligent attempts to provide appropriate services to the youth and his or her family unless it is determined that there is no substantial likelihood that the youth and his or her family will benefit from further diversion attempts. Notwithstanding the provisions of section two hundred sixteen-c of this act, the clerk shall not accept for filing under this part any petition that does not have attached thereto the documentation required by subdivision (g) of this section.

(d) Diversion services shall include documented diligent attempts to engage the youth and his or her family in appropriately targeted community-based services, but shall not be limited to: (*Note see appeal)

(i) providing, at the first contact, information on the availability of or a referral to services in the geographic area where the youth and his or her family are located that may be of benefit in avoiding the need to file a petition under this article; including the availability, for up to twenty-one days, of a residential respite program, if the youth and his or her parent or other person legally responsible for his or her care agree, and the availability of other non-residential crisis intervention programs such as family crisis counseling or alternative dispute resolution programs or an educational program as defined in section four hundred fifty-eight-l of the social services law.

18. Shortly after, the judge said "one or both parents have to go downstairs to probation and file a pins petition". Attorney Rosoff, who had been appointed to represent me just moments before, said that I would file the PINS petition. I repeatedly expressed I did not want to do this, that Sage was not a PINS, and that I had heard horrible stories about them taking children away. Attorney Rosoff advised me this was an order from the judge, although he knew at that time that a judge could not in fact order such a thing, and that no order had been issued. The probation department denied my PINS petition, stating Sage's behavior was not consistent with "PINS", which I had been saying all along. Attorney Rosoff was nothing short of furious; his personal animous towards Sage was palpable. After meeting ex parte with the judge, Attorney Rosoff told me the judge had ordered him to draw up a new PINS petition, that I was ordered to sign it, and Attorney Rosoff would then return it to the judge. Attorney Rosoff knew there was no such order, and he knew all of this was in violation of NYS and Westchester County PINS process and law, which among other things, mandates PINS petitions be filed with probation, and that probation supply diversion services. Attorney Rosoff lied to me repeatedly including telling me it was an order of the court for me to sign the new petition which he had drawn up, and which contained lies about Sage presumably in order to "make sure" Sage was considered a PINS.

19. Attorney Salant, Sage's father's attorney, and attorney Evelyn Isaac, Sage's attorney, were also aware of the violations of law this "fake" petition and these non-existent court orders presented; this fake PINS petition languished with the judge for 8 months! Each attorney perpetuated these lies and at no time advised any of us. In doing so Sage was denied his constitutional right to due process, and each and every attorney named repeatedly committed malpractice. During those 8 months attorney Rosoff told me, attorney Salant told Sage's father, and attorney Isaac told Sage that he was a "PINS", though no "S" docket ever appeared; rather the judge would add language and "rules" to a temporary order of custody after each court appearance. Each attorney's involvement in perpetuating these lies and the fear and intimidation that both Sage and I lived with, not knowing these orders were false, was malicious and would shock the conscious of any reasonable person. Each and every attorney involved in this case and named in this claim (hereinafter referred to collectively as "attorneys") specialized in family law and had handled numerous PINS proceedings. Indeed, if they had no experience in PINS matters, they were required to withdraw as counsel as they would not have been qualified.

20. After 8 months attorney Isaac inquired of the judge as to diversion services; no hearing was held; attorney Isaac verbally entered a guilty plea. Attorney Isaac was aware that Sage needed to be advised of his rights, and that she could not enter a plea on his behalf; she said or did nothing. The judge said he would send the petition to probation for diversion services.

21. The petition was assigned to Probation Officer Jennifer Malandrino, who worked specifically in the PINS unit. PO Malandrino handles only juvenile matters such as PINS and was familiar with NYS and county law, and therefore knew that diversion services and reunification services were required by law. She had an obligation NOT to act on this false petition, and to notify her superiors that the

petition originated from a judge who had already designated Sage a PINS without abiding by law. My first statement to PO Malandrino was "Finally, he can get some diversion services" to which she replied "Oh he's way past diversion services; he's already been designated a PINS". By knowingly breaking the law that requires diversion services and reunification services, PO Malandrino acted with malice; he actions violated Sage's due process rights and ultimately would violate multiple civil rights of both Sage's and mine.

22. While performing these acts, PO Malandrino, at the beginning, convinced me she wanted to keep the family together. She encouraged me to confide in her anything I knew of that would help her make a case for Sage to live with me and not his father. I trusted her. Unbeknownst to me, she encouraged Sage and Sage's father to confide anything they knew that would help her make a case for Sage to live with his father. As a result, Sage trusted her. This created a "special relationship" in that PO Malandrino was entrusted with sage's future. Her duties to Sage included family reunification, a duty so blatantly disregarded as to shock the conscious, and to provide diversion services. In short, the law required her to take all possible measures to keep Sage OUT of the court system that could ultimately lead to his seizure. She ignored her duty, took the law into her own hands, and acted out of malice towards both Sage and me. I repeatedly asked PO Malandrino, and attorney Rosoff, if I could withdraw the PINS petition; I was told there was no such thing. This was a lie. There is absolutely a process in place and commonly used where a PINS petition can be withdrawn.

23. At this time Sage was living with his father in Putnam County. As such, by law, his PINS probation was required to be transferred to Putnam County. PO Malandrino was away so I asked Jane Doe # 3, who said she would check; she said there was no need to transfer the probation. I believe this was in order to prevent another probation department from discovering what was happening.

24. During this entire time, Westchester Child Protective Services has "mysteriously" been called multiple times to investigate me. I had CPS workers showing up at my home day and night. One worker told Sage "you are lucky to have a Mom that cares so much about you and is so involved". Each and every report was unfounded.

25. In March of 2013, Sage's father was arrested for felony possession of drugs and endangering the welfare of a minor. KerryAnn Rice of Putnam County CPS was assigned to the case. She assured me that she had met with Sage and with Sage's grandmother (Sage's father was in jail) and that Sage told her he would be willing to come home and live with me while his father was in jail. She then did nothing. I was his parent and had joint custody of Sage. Sage's father was in jail and he was living with his grandmother; Kerri Ann Rice did nothing to return my child to me; she said that because he was over the age of 16, there was nothing she could do. Soon after Sage had an argument with his uncle and his grandmother, who called Kerri Ann Rick and asked her what they should do. Kerri Ann Rice suggested they call me; Sage's grandmother said "I don't know her number" and Kerry Ann Rice, who had my phone number and had spoken to me frequently, replied "then call the police".

26. It is my belief, and Sage's belief, Kerry Ann Rice was conspiring with Jennifer Malandrino to keep Sage and I apart, at all costs.

27. The police were called and Sage was arrested. PO Malandrino advised me that she would have to violate Sage's suspended sentence, but that this would surely make a case for him to live with me. She encouraged me to help her put together a case against my son as it was the only way to get him away from his father, who was been CONVICTED OF ENDANGERING HIS WELFARE! At any time PO Malandrino and everyone else involved had the ability to return Sage to me, but told me they did not. PO Malandrino said the only way to do it was to get back into court, violate Sage, and recommend the judge return him to me.

28. Based on an unsubstantiated allegation that drugs supposedly found in Sage's father's closet, but that no longer existed because they had been flushed down the toilet, were in fact Sage's, PO Malandrino violated Sage's suspended sentence.

29. We now had a new judge. My son was finally going to be returned to me. To my horror, PO Malandrino lied to the judge, telling her neither parent's home was a possibility at this moment, and that Sage should be "held temporarily while a plan was put in place". Held temporarily? Sage had never once missed a court appearance, probation appointment, school, nothing. The law allows a PINS to be temporarily held in non secure detention only if it is alleged he is a flight risk! No such allegations were made. Indeed, it was implied it was for his safety, to keep him away from his parents! Although we did not realize it at the time, PO Malandrino was beginning her plan to keep Sage away from me at all costs. Not one attorney in that court room objected, nor did they advise Sage or me that there were no grounds to detain Sage. Attorney Rosoff for one was nothing short of elated. His disdain for Sage knew no bounds; he had repeatedly told me Sage would get what he deserved. As we left the court room, he looked at me and said "Now THAT'S an attorney!". With no legal grounds to detain him, and with a loving, warm home in an award winning school district, with a mother proven repeatedly to be a fit parent, Sage was instead sent to Children's Village, a "non secure" detention facility known to DSS and Probation to be so rife with crime and physical and sexual abuse that the county has settled multiple lawsuits.

30. I was beside myself. My world was rocked. It became apparent to me that PO Malandrino's motivation to keep Sage from me was based in part on false information Sage had given months prior, alleging abuse on my part. I later learned that attorney Salant had advised Sage and Sage's father that in light of there not being any indicated findings from CPS, they should "beef up" the complaints to ensure custody would go to Sage's father.

31. I went to Children's Village and saw Sage, and advised him what was going on. He knew he had to tell the truth, and met with his caseworker, Andrew Barijikian, and told him everything, that he had made up the allegations in order to live with his father. Andrew Barijikian had a legal obligation to disclose this exculpatory evidence, and chose to ignore it, in violation of Sage's civil rights. Andrew Barijikian assured me everything would be fine, we would have a meeting after they had had a chance to evaluate Sage, and then I would be involved in all next steps. He advised Sage of the same thing, creating a "special relationship". He was lying.

32. Meanwhile PO Malandrino continued to assure me that everything would be fine with Sage. Until one day, out of the blue, she said she had to look at other options "in case Sage doesn't come home". I panicked and asked her what she was talking about. She told me if Sage refused to live with me, he

"might have to be put in placement". I assured her Sage wanted to live with me. Sage told Andrew Barijikian he wanted to live with me.

33. It is my contention that PO Jennifer Malandrino conspired with Andrew Barijikian of Children's Village, and with Jane Doe's number 1 and 2 and John Doe number 1 of Westchester County Dept. of Social Services, as well as with Judge Malone, to remove Sage from my care and custody and deprive us of our civil rights.

34. At our next court date, Sage and I were shocked. With no notice or discussion, PO Malandrino testified that there was no suitable place for Sage to live, and that she would begin seeking placement. Evelyn Isaac, Sage's attorney, aware that each and every thing that was being done was illegal, said and did nothing. Sage was returned to Children's Village.

35. It came to my attention that PO Malandrino had now discussed with Sage's father the possibility of Sage living with a neighbor of mine. At the suggestion of Sage's father, who had recently been convicted of felony drug possession and endangering Sage's welfare, without a word to me, PO Malandrino phoned Mahdy Franco, a neighbor and family friend, and asked her if she would be willing to take legal custody of Sage until his 18th birthday. I met with Mahdy Franco and expressed my shock and sense of betrayal. She told me that she had been approached by Sage's father, and subsequently PO Malandrino, to take custody of Sage if it was the only alternative to seizing him and placing him in foster care. I told her that while I appreciated the offer, I was a fit parent and was certainly not going to sign over custody of my child to her or anyone else. I was however relieved to know that Sage apparently wasn't going to placement.

36. At our next court appearance, PO Malandrino advised the court that she had lined up a suitable family in the community, right down the street from my house, and in Sage's lifelong school district, that had been willing to take custody of Sage, but that I had intimidated them and threatened them, so that they were no longer comfortable seeking custody. This was a lie. PO Malandrino then asked the judge to ORDER THE FRANCO'S TO FILE A CUSTODY PETITION IN FAMILY COURT! The judge said she could not order that. Sage was returned to Children's Village. At no time did PO Malandrino inquire about or approach any local family members about Sage, several of whom were local and would have been happy to help. By seizing Sage via a PINS petition and not a neglect proceeding, PO Malandrino circumvented to social services laws.

37. Children's Village held 2 quick, aggressive meetings, one with Sage's father and one with me. The tone was hostile. At one point I was told that the custody proceedings were literally, child abuse. I brought photographs of Sage with me, and his sister, and his pets, to the meeting. I pleaded with every fiber of my being to let this boy come home and be a child, and live in a home. I implored them to understand that a custody proceeding brought to protect Sage had spiraled out of control. Some attendees of the meeting refused to look at the photographs. They refused to turn over or let me review any reports or evaluations.

38. At our next court appearance, I was not allowed to bring anyone into the court room with me. It was full of people I had never seen. Sage now had a new attorney, Andrew Szniak. Sage did not get the opportunity to call witnesses, nor did any of us have the opportunity to review the reports that were handed to the judge. The law states that Sage and his attorney must have those reports no less than

10 days prior to the hearing in order to prepare a defense; they were handed to Attorney Szezniack at the hearing. He did not object. At the recommendation of PO Malandrino, Andrew Berijikian of Children's Village, Jane Doe's 1 and 2 of Westchester County Dept. of Social Services, John Doe # 1 of Westchester County Dept. of Social Services, and John Doe # 2, acting on behalf of the Westchester County Attorney, Sage was sentenced to placement 2 ½ hours from home at Berkshire Farm until his 18th birthday, app. 910 months. This time period was designed to do one thing: keep Sage from me until he was old enough to live on his own. It had nothing to do with a crime. Although there were multiple alternatives much closer to home, and although the least restrictive placement is required, and the placement closest to home is required, these individuals and agencies conspired to keep Sage from me, and me from Sage. Attorney Sezniak stated that if Sage was able to live in the community, and attend his old high school, how could he be a danger to the community requiring placement 2 ½ hours away. No one replied. The judge stated that "whenever child protective services removes a child from the home, a report will be done. Is someone doing that report?". Someone in the back said they were. This is malicious prosecution and every element for that claim is met.

39. In short, this entire situation is an article ten proceeding disguised as a PINS proceeding because these individuals and agencies were determined to seize Sage and keep him away from me.

40. Berkshire Farm is a non secure detention facility filled with all levels of criminal including sex offenders. While there, a "cottage supervisor" allowed residents to take turn hitting Sage's head with textbooks repeatedly. Other "supervisors" looked the other way while Sage was tackled, his pants pulled down, and photos were taken of him by the residents, using the forbidden cell phones the supervisors allowed them, but not Sage, to have. Sage's caseworker Ashley Spence knew immediately that something was wrong, and that Sage did not belong there. A sympathetic worker at the "visitation center" knew too, and commented to me that they had more kids from Westchester County than anywhere else.

41. Westchester County DSS has requirements, which are not legal, in order to be released from placement. Although Berkshire Farm and Ashley Spence wanted to get Sage home right away, they were under contract with DSS and had to follow their rules. Sage and I were required to participate for several months in a program called "Parenting with love and limits". At no time had any parenting or any social services been recommended or required, nor had I been found to be unfit. This was a condition for consideration for release. This program was in no way applicable to our situation yet we had to do it and complete it to even be considered for release, with no guarantee. Our caseworker Michelle DeCuffa was excellent, and very smart. She knew exactly what had happened to us, and worked hard to make the process as painless as possible while adhering strictly to the program's guidelines. I was unemployed and broke, and often without a car; when possible, Michelle would travel to me for our sessions. Her enthusiasm at our possible reunification did not go unnoticed; Michelle DeCuffa was abruptly fired.

42. I met with Marisol Gonzales, the case supervisor for Westchester County DSS, app.mid way through the PLL program. She was hostile. She brought a PLL Director to the meeting and they began to discuss Sage going to trade school after high school, Sage "stepping down" to a group home in a few months…my heart sank. Trade school? I was his parent! I told them Sage would be going to college.

Marisol looked at me like I had 2 heads. I later learned the odds of a child who had been in foster care going to college were very slim. Yet, these individuals and agencies broke every possible law under the guise of "what was best for Sage". Marisol said she was not comfortable sending Sage home but would give no reason. Each time DSS set a condition, we met it, and then they would set another condition. I repeatedly asked how this could be legal, was there no process at all for Sage to just come home? I was told I could file an appeal in court. This was a lie: as the supervisor Marisol knew full well that all I had to do was file a petition to suspend placement, and she kept that information from me. Ultimately I found out about it, and filed it. Though still "at war" Marisol's tone changed. She seemed resigned to Sage's leaving placement, no doubt because he shouldn't have been seized in the first place, but committed to keeping him from being returned to me. However the conditions continued. She would agree only to a group home in lower Westchester. I got her attention when I told her that would result in Sage's attending 5 high schools in one year, and that it was surely educational neglect. That got her attention. She then gave us a new condition for release: that a pending criminal matter that we were planning on fighting must be closed. In no uncertain terms, Marisol stated that the only way she would petition for Sage's release was if that case was closed. Therefore, if Sage chose to defend himself for something he had been falsely accused of, he would have to do it from Berkshire Farm, until his 18th birthday. Sage had no choice but to plead guilty, albeit to a lesser charge, in order to be freed. This violated Sage's 5th amendment right against self incrimination and forced him to endure months of probation for something he did not do. It delayed his college education because he was prevented from leaving the county.

43. In the end, the Westchester County Attorney who had conspired with PO Malandrino, Children's Village and DSS to falsely send Sage away, petitioned the court for Sage's release. The primary condition of that release was that he be released to the care and custody of me, his mother, and no one else. We were required to participate with PLL and other aftercare until Sage's 18th birthday. It was as though everyone knew they were going to get caught if they didn't release Sage. By this time I had county legislators involved, and I had gone all the way to Albany to expose these injustices. My life will never be the same. How does one heal a broken heart, or put a price on it?

44. Much later, I learned about the requirements of a PINS petition, including the fact that the diligent efforts at diversion and reunification must be documented and attached to the petition. All parties involved knew the petition was not only fraudulent, and that it had circumvented the law; they also knew that no efforts at diversion or reunification had been made, and that the petition was among other things jurisdictionally deficient. All looked the other way. I gave the PINS law, and the case law, to Andrew Szezniak to file an appeal. He reluctantly agreed to do so but said to me "Listen there will be no white knights here, I'm not going to go crazy on this thing". Sage fired him and Attorney Dan Pagano filed the appeal. We won. Everything was dismissed, after the fact, acknowledging collateral damage.

45. As further proof of Westchester County's pattern and practice of unlawfully removing children from their homes, it is worth noting that the case law I gave to Dan Pagano included several instances right in Westchester County; the petitions were jurisdictionally defective and ultimately dismissed. I

wonder how many appeals didn't get filed. Ironically in one case, the judge was Malone, the judge that sent Sage away. She tried to "bootstrap" a JD petition onto a PINS petition, ensuring the child would be removed. It was overturned on appeal; the appellate court said of Judge Malone: "The family court can not do indirectly what it is not allowed to do directly". Yet that is exactly what was done here! They couldn't file a neglect petition "directly" so they did one "indirectly" disguised as a PINS petition! All the County players were the same.

46. Although Sage was sentenced to Berkshire Farm on May 15, 2013, the order was not entered until August 23, 2013; therefore the statute of limitations is 3 years from that date.